IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NAUTILUS INSURANCE CO. | : |
| | : CIVIL ACTION |
| v. | : |
| | : NOS. 18-1364, 18-1545 |
| | : |
| 200 CHRISTIAN STREET PARTNERS, LLC | : |
| *et al.* | : |

**SURRICK, J.**                                                              **JANUARY 30, 2019**

### MEMORANDUM

Presently before the Court are Nautilus Insurance Co.'s Motions for Judgment on the Pleadings. (Nautilus I MJP, ECF No. 14; Nautilus II MJP, ECF No. 41.)[1] In each of these Motions, Nautilus seeks a declaratory judgment that it does not have a duty to defend and indemnify 200 Christian Street Partners, Virgil Procaccino, and Arthur Elwood (collectively, "Defendants") in two underlying lawsuits. We will deny Nautilus's Motions. Nautilus has a duty to defend Defendants in the underlying actions because the plaintiffs in the underlying actions sufficiently allege products-related tort claims such that there may have been an "occurrence" as that term is defined in Defendants' policy.

### I.   BACKGROUND

This action relates to two homes that Defendant constructed in Philadelphia, Pennsylvania. One of the homes is located at 501A South 12th Street and the other is located at 507 South 12th Street. The owners of each of the homes (collectively, the "Owners") allege that the homes were defectively constructed. They have each brought lawsuits against Defendants

---

[1] All citations to "Nautilus I" refer to Case No. 18-1364 and all citations to "Nautilus II" refer to Case No. 18-1545.

for damages regarding the defects. On November 4, 2016, the owners of the home located at 501A South 12th Street filed a complaint in this Court. (*See* Compl., *Milo, LLC v. Procaccino et al.*, No. 16-5759 (E.D. Pa. Nov. 4, 2016) ("*Milo*") (ECF No. 1).) On September 21, 2017, the owners of the home located at 507 South 12th Street filed a complaint in the Court of Common Pleas of Philadelphia County. (*See* Compl., *Zachary Klehr et al. v. Procaccino et al.*, No. 170902547 (Ct. Com. Pl., Phila. Cty., Pa. Sep. 21, 2017) ("*Klehr*")) (*Klehr* complaint, together with *Milo* complaint, the "Underlying Complaints"). On January 9, 2018, and May 2, 2018, Defendants filed joinder complaints adding subcontractors and product suppliers as defendants in each underlying action.

In their respective underlying complaints, the Owners assert similar allegations that Defendants purposefully marketed themselves as sellers of luxury homes yet sold the Owners homes that were riddled with construction defects. The Owners allege that Defendants, when confronted with the defects, failed to adequately remedy the defects or inform the Owners of the significance of the defects. Each lawsuit alleges: (1) violations of the Pennsylvania Uniform Trade Practices and Consumer Protection Law for Defendants' misrepresentation of the quality and character of the home; (2) breach of contract and violation of the Pennsylvania Real Estate Seller Disclosure Law for failure to disclose material defects in the property; (3) breach of Defendants' implied warranty of habitability for construction of an unsafe home, use of faulty materials, and failure to construct the homes in a workmanlike manner according to sound building standards and architectural drawings; (4) breach of express warranty that all defects would be remedied; (5) negligence in construction of the home; (6) negligence in selecting, training, and supervising employees and subcontractors; and (7) civil conspiracy for conspiring

to fraudulently represent that they had constructed a home free from major defects. The Owners seek actual, treble, and punitive damages.

Nautilus is providing Defendants with a defense against the Owners' lawsuits pursuant to a Commercial Lines Policy of insurance that it issued to Defendants for the time periods covering the damages to the Owners' homes. (Nautilus Policy, Nautilus I MJP Ex. A, Nautilus II MJP Ex. B.) On April 2, 2018, and April 12, 2018, Nautilus filed Complaints in this Court against Defendants and the respective Owners[2] seeking, in each of the above cases, a declaratory judgment that it is not required to defend Defendants in either case. (Nautilus I, ECF No. 1; Nautilus II, ECF No. 1.) On August 6, 2018, and October 2, 2018, Nautilus filed the instant Motions for Judgment on the Pleadings, which are largely identical. (Nautilus I, ECF No. 14; Nautilus II, ECF No. 41.) On August 20, 2018, and October 23, 2018, Defendants filed Responses to the Motions. (Nautilus I, ECF No. 16; Nautilus II, ECF No. 44.) Nautilus filed Replies on August 24, 2018, and October 29, 2018. (Nautilus I, ECF No. 17; Nautilus II, ECF No. 45.) The Responses and Replies between the two actions are also largely identical. The Owners filed their respective Responses to the Motions on September 4, 2018, and October 15, 2018. (Nautilus II ECF No. 18; Nautilus II ECF No. 42.)

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure allow a party to move for judgment on the pleadings under Rule 12(c) "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). We may grant a Rule 12(c) motion only if there are no issues of material fact remaining. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008)

---

[2] Nautilus's Complaint in Nautilus II also included several of Defendants' subcontractors as defendants, but those defendants have not responded to this Motion.

("Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved . . ." (citation and quotations omitted)).

Because "[t]he interpretation of an insurance policy is a question of law . . . [c]ourts may . . . dispose of such cases on motions for judgment on the pleadings where the sole issue concerns the interpretation of the policy." *Allstate Ins. Co. v. Key-Berthau*, No. 08-768, 2008 WL 5382924, at *5 (E.D. Pa. Dec. 19, 2008) (internal citation and quotation marks omitted); *see also Sciolla v. W. Bend Mut. Ins. Co.*, 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013) ("Interpreting an insurance policy 'is a question of law' for the Court to determine." (citations omitted)). In this case, we are being asked to interpret the insurance policy and determine whether Nautilus has a duty to defend Defendants under the terms of the policy.

## III. DISCUSSION

Nautilus contends that all of the allegations in the Underlying Complaints stem from issues regarding Defendants' faulty workmanship. The parties agree that Pennsylvania law does not consider faulty workmanship to be an "occurrence" that is covered under a Commercial General Liability ("CGL") policy. However, Defendants and the Owners counter that Pennsylvania law does recognize product-related tort claims, such as product malfunctions, as "occurrences," and the Underlying Complaints allege such malfunctions. Moreover, Defendants argue that there were no bargained-for standards between the Owners and Defendants regarding Defendants' work product, the homes. Defendants argue that, without such standards in place, any defects in the homes are sufficiently accidental to constitute "occurrences."

### A. Applicable Law

In order to determine whether Nautilus is required to defend Defendants in the underlying lawsuits, we must (1) "determine the scope of coverage under the insurance policy itself" and

4

(2) "ascertain whether the complaint against the insured states a claim that is potentially covered under the policy." *Allstate Ins. Co. v. Drumheller*, 185 F. App'x 152, 154 n.2 (3d Cir. 2006). Whether the complaint is potentially covered under the policy is "determined *solely* from the language of the complaint *against the insured.*" *Lenick Constr., Inc. v. Selective Way Ins. Co.*, 737 F. App'x 92, 94 (3d Cir. 2018) (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006)) (emphasis in *Lenick*). In addition, "[i]n determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 596 (3d Cir. 2009) (citation omitted). "It is well-settled that it is the *nature of the allegations* themselves, not the particular cause of action that is pled in the complaint that determines whether coverage has been triggered." *J.J.D. Urethane Co. v. Westfield Ins. Co.*, No. 1440 EDA 2017, 2018 WL 796428, at *5 (Pa. Super. Ct. Feb. 9, 2018) (citing *Mutual Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)) (emphasis in *J.J.D. Urethane*). "[A]n insurer has a duty to defend if there is any possibility that its coverage has been triggered by allegations in the underlying complaint." *See Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 674 (3d Cir. 2016) (citing *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010)).

### B. Scope of Coverage Under the Nautilus Policy

The policy between Nautilus and Defendants includes CGL coverage. With regard to such coverage, the policy states:

   a. [W]e will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply...

   b. This insurance applies to "bodily injury" and "property damage" only if: (1) The "bodily injury" or "property damage" is caused by an "occurrence"...

5

(Nautilus Policy § I(A)(1)(a-b).) The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Nautilus Policy § V(13).)

Therefore, whether Nautilus has a duty to defend Defendants in the underlying suits depends upon whether there was an "occurrence" triggering coverage. When an "occurrence" is defined as an "accident" under a CGL policy, as it is here, courts look to the ordinary definition of the word "accident" to examine "whether the damage that is the impetus of [the] suit was caused by an accident, so as to constitute an occurrence under the policy." *Kvaerner*, 908 A.2d at 897-98.

### C. Whether an Underlying Complaint States a Claim That is Potentially Covered Under the Policy

Faulty workmanship is not considered an "occurrence" triggering an insurer's duty to defend because "such claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident.'" *Kvaerner*, 908 A.2d at 897-99 (defining "accident" as "[a]n unexpected and undesirable event," or "something that occurs unexpectedly or unintentionally." (quoting Webster's II New College Dictionary 6 (2001))). Because faulty workmanship is not considered an occurrence, an insurer does not have a duty to defend claims stemming from faulty workmanship. *Id.* at 899. This is true whether the claims sound in contract law, for failure to abide by particular contractual standards, or tort law, for negligence in manufacturing a product. *See, e.g., Specialty Surfaces Int'l v. Cont'l Cas. Co.*, 609 F.3d 223, 231 (3d Cir. 2010) (stating, in case regarding manufacture and installation of defective turf field, "[f]aulty workmanship, even when cast as a negligence claim, does not constitute [an occurrence] . . ."); *Firemen's Ins. Co. of Washington, D.C. v. Tray-Pak Corp.*, 130 F. Supp. 3d 973, 982 (E.D. Pa. 2015) (stating that claims of "negligent or defective design, in a case in which the product is designed pursuant to

6

and in accordance with a contract" are insufficiently accidental (citation omitted)); *Kvaerner*, 908 A.2d at 888, 898-900 (finding persuasive that contractor had bargained for its own standards of workmanship and then failed to live up to them, contributing to holding that damages were foreseeable). Neither does the insurer have a duty to defend claims for "damages that are a reasonably foreseeable result of the faulty workmanship," such as water leaks in a defectively constructed home. *Specialty Surfaces*, 609 F.3d at 239 (citing *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 713-14 (Pa. Super. Ct. 2008)).

However, there are two relevant circumstances that may trigger coverage under a CGL policy. First, the Pennsylvania Supreme Court has approvingly cited a case holding that "a CGL policy may provide coverage where faulty workmanship caused bodily injury or damage to another property . . ." *Kvaerner*, 908 A.2d at 898-99 (citing *L-J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 621 S.E.2d 33, 36 n.4 (S.C. 2005)); *see also CPB Int'l*, 562 F.3d at 598 ("CGL 'coverage is for tort liability for physical damages to others . . .'" (quoting *Kvaerner*, 908 A.2d at 899 n. 10)). Second, the Pennsylvania Superior Court has stated that an event is sufficiently fortuitous to constitute an "occurrence" when an insured's product actively malfunctions. *See generally, Indalex Inc. v. Nat'l Union Fire Ins. Co.*, 83 A.3d 418 (Pa. Super. Ct. 2012); *see also Quality Stone Veneer, Inc. v. Selective Ins. Co. of Am.*, 229 F. Supp. 3d 351, 359 (E.D. Pa. 2017); *Tray-Pak Corp.*, 130 F. Supp. 3d at 981.

Both of these circumstances were present in *Indalex*. The court in *Indalex* found that the insurer had a duty to defend the insured contractor. In *Indalex*, a number of homeowners sued the defendant for "windows and doors [that] were defectively designed or manufactured and resulted in water leakage that caused physical damage, such as mold and cracked walls, in addition to personal injury." *Id.* at 419-20. The *Indalex* court stated that "we have an off-the-

7

shelf product that failed and allegedly caused property damage and personal injury... Here, there are issues framed in terms of a bad product, which can be construed as an 'active malfunction,' and not merely bad workmanship." *Id.* at 424. The court concluded that an active malfunction is fortuitous enough to constitute an "occurrence," and that the complaint sufficiently alleged such a claim to potentially bring the suit within the scope of the policy's coverage. *Id.* at 425.

Although the Pennsylvania Supreme Court has not yet adopted the holding in *Indalex*, we are persuaded that they will do so. First, the Pennsylvania Supreme Court has supported the position that CGL policies cover tort liability such as product defect claims. *See Kvaerner*, 908 A.2d at 899, n. 10 ("[CGL] coverage is for tort liability for physical damages to others..." (quoting *Insurance Protection for Products Liability and Completed Operations; What Every Lawyer Should Know*, 50 NEB. L. REV. 415, 441 (1971))). In addition, the Third Circuit and other courts have cited *Indalex* in assessing whether there was a product-related "occurrence." *See, e.g., Lenick*, 737 F. App'x at 95 (assessing underlying complaint to determine if it alleges product-related tort claim so as to qualify for "occurrence" under *Indalex*); *Northridge Vill., LP v. Travelers Indem. Co.*, No. 15-1947, 2017 U.S. Dist. LEXIS 140541, *31-32 (E.D. Pa. Aug. 31, 2017) (same); *Tray-Pak Corp.*, 130 F.Supp. 3d at 982 (same); *J.J.D. Urethane*, 2018 WL 796428, at *6 (same); *see also CPB Int'l*, Inc., 562 F.3d at 597 ("[O]pinions of intermediate appellate state courts are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (quoting *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000)) (quotation marks omitted)).

Nautilus urges us to ignore *Indalex* for two reasons. First, it argues that the definition of "occurrence" in *Indalex* was different from the definition in the policy at issue in this case,

8

rendering *Indalex* inapplicable. In *Indalex*, the policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage *neither expected nor intended from the standpoint of the Insured.*" *Indalex*, 83 A.3d at 425 (emphasis in original). The court found persuasive the fact that the emphasized portion of the definition was a subjective element not found in the policy at issue in *Kvaerner* (or in the policy at issue in this case). *See id.* This is a distinction without a difference. The court in *Kvaerner* applied the ordinary definition of "accident" to the policies' definitions of "occurrence." *Kvaerner*, 908 A.2d at 897-98. As stated above, the ordinary definition of "accident," which refers to an *unexpected* event, includes nearly identical subjective language to the definition of "occurrence" in *Indalex*. Further, Pennsylvania law dictates that the unexpected nature of an accident be from the standpoint of the insured. *See Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 293 (Pa. 2007) (stating, in duty to defend case, "we are required to determine whether, from the perspective of the insured, the claims asserted by the Owners present the degree of fortuity contemplated by the ordinary definition of 'accident'"). Therefore, we do not find persuasive the fact that "occurrence" is defined differently in this policy than it was in *Indalex*.

Next, Nautilus urges us to ignore *Indalex* because the "gist" of the underlying lawsuits is in contract, such that the Owners are precluded from bringing negligence claims like those in *Indalex*. The Pennsylvania Superior Court followed such an approach in *Erie Ins. Exchange v. Abbott Furnace Co.*, 972 A.2d 1232, 1238-39 (Pa. Super. Ct. 2009). In that case, the court analyzed a similar complaint to the Underlying Complaints here, which sounded in both tort and contract, and held that the tort claim was not adequately pled because the "gist" of the complaint was in contract rather than tort. *See id.* However, the Pennsylvania Supreme Court has not ruled

9

on whether this "gist of the action" doctrine should apply in duty to defend cases, and the Superior Court and the Third Circuit have declined to apply it in duty to defend cases. *See, e.g., Berg Chilling*, 70 F. App'x at 624 ("The test has not been adopted by the Pennsylvania Supreme Court and it does not comport with the case law of this Circuit."); *State Farm Fire & Cas. Co. v. McDermott*, No. 11-5508, 2014 U.S. Dist. LEXIS 147702 (E.D. Pa. Oct. 14, 2014) (citing *Berg Chilling* for refusal to use gist of action doctrine in duty to defend case); *Indalex*, 83 A.3d at 425-26 (explaining refusal to apply gist of action doctrine).

### D. The Instant Underlying Complaints Sufficiently Allege Product-Related Tort Claims

In order to determine whether the Underlying Complaints sufficiently allege product-related tort claims, we must examine the allegations made in the Underlying Complaints.[3] The underlying complaint in Nautilus I alleges that Defendants "represent[ed] that they do not 'skimp' on construction." (*Milo* Am. Compl. ¶ 5, Nautilus I ECF No. 1 Ex. B.) It also states multiple times that "[t]he Home was not free from . . . faulty materials." (*Id.* ¶¶ 37, 193; *see also id.* ¶¶ 190, 203.) The homeowners detailed specific concerns with certain products, including the windows, which caused water damage and mushrooms inside the home. (*Id.* ¶ 75 ("Defendants . . . represented that the water infiltration was the result of a limited problem with a bedroom window . . .").) Defendants themselves recognized the defect with the window because they stated "that the entire window—including the sash—would be replaced to ensure that the mushroom would not reoccur," yet they failed to follow through. (*Id.* ¶¶ 76-77.) The complaint

---

[3] Although we are required to determine whether there is a duty to defend "*solely* from the language of the complaint *against the insured*," *Lenick*, 737 F. App'x at 94 (quoting *Kvaerner*, 908 A.2d at 896) (emphasis in *Lenick*), it is interesting to note that, in both underlying lawsuits here, Defendants joined several third-party defendants on theories of strict product liability for providing defective products to be used in the construction of the subject homes. (*See Milo* Joinder Compl., ECF No. 23; *Klehr* Joinder Compl.).

10

also alleges that the homeowners' damages were caused by the home's lack of an "effective moisture-barrier," which is comprised of several products. (*Id.* ¶ 68.) Finally, the complaint states that the homeowners were forced to relocate because of the safety hazards in the home, and the hazards may have caused respiratory problems in their newborn child. (*Id.* ¶¶ 10, 71.)

The underlying complaint in Nautilus II similarly alleges that Defendants "represent[ed] that they do not 'skimp' on construction" and that the home was constructed with "faulty materials." (*Klehr* Am. Compl. ¶¶ 5, 33, 224, 227, 237, Nautilus II Ex. A.) The complaint also alleges issues with specific products, such as windows, a door, the air conditioning, and the moisture barrier. (*Id.* ¶¶ 60-61, 98, 106.) As in the underlying complaint in Nautilus I, the underlying complaint in Nautilus II alleges that Defendants acknowledged that water damage "was from one of [the] windows." (*Id.* at ¶ 88.) Finally, the complaint alleged that these defects were "life-threatening." (*Id.* ¶ 126.)

Defendants raise two arguments in support of the contention that Nautilus has a duty to defend in the underlying lawsuits. First, Defendants argue that the Owners did not contract with them for the construction of the Owners' homes; rather, they contracted for the purchase of the completed homes. Defendants argue that they did not have any bargained-for contractual standards to live up to and any defects contained in the homes were unforeseeable malfunctions. This argument fails because the focus of our inquiry is whether damages stemming from faulty workmanship are foreseeable; the presence of a contract with bargained-for standards contributes to foreseeability, but is not required. *See, e.g., CPB Int'l*, 562 F.3d at 596 ("[I]t is largely within the insured's control whether it supplies the agreed-upon product, and the fact that contractual liability flows from the failure to provide that product is too foreseeable to be considered an accident."); *Kvaerner*, 908 A.2d at 898 ("The key term in the ordinary definition of 'accident' is

11

'unexpected.' This implies a degree of fortuity that is not present in a claim for faulty workmanship."); *Gambone*, 941 A.2d at 713 (stating that homeowners had agreement to purchase home from insured, without discussing whether there were bargained-for standards in purchase, and holding there is no duty to defend faulty workmanship in homes).

Moreover, the Third Circuit expressly rejected Defendants' argument in *Nationwide Mutual Insurance Co. v. CPB International, Inc.*, 562 F.3d 591, 596 (3d Cir. 2009). In that case, the defendant imported and sold to the plaintiff defective chondroitin pursuant to a supply contract. *Id.* at 594. The plaintiff sued the defendant for breach of contract. *Id.* The court held that the defendant's insurer had no duty to defend because the defendant's delivery of the completed product, although it incorporated a defective component, was not an accidental "occurrence." *Id.* at 596. Rather, it was a failure to perform quality control of the product for which the plaintiff had contracted. *Id.* Here, Defendants argue that the Owners contracted with Defendants for completed homes, which may have included defective components. According to *CPB International*, and *under a breach of contract theory*, this would not be an "occurrence," but the result of Defendants' failure to perform quality control on the homes.

However, the court in *CPB International* did not address whether the use of a defective product could be considered an "occurrence" when the underlying complaint alleged a negligence claim for use of the defective product, rather than solely for breach of contract, and when it caused personal injuries. As mentioned above, the Pennsylvania Superior Court in *Indalex* found that an insurer's duty to defend was triggered by an occurrence when the underlying complaints alleged product-related tort claims that caused personal injuries. In *Indalex*, the parties' submissions to the court sampled from and discussed language from at least one of the underlying complaints that included allegations similar to those alleged in this case:

12

"[window] products were in a defective condition unreasonably dangerous to the user/consumer or its property"; "[a]s a result of the defective products . . . Plaintiffs have sustained actual damages as outlined above," including mold contamination due to water infiltration; "[l]ack of proper door/window flashing has caused water to infiltrate the buildings"; and other references to "design and/or construction defects." *See* Opp. to Def.'s Mot. Summ. Judg. 17-22, *Indalex Inc. et al. v. Nat'l Union Fire Ins. Co. of America*, No. GD 06-21147 (Ct. Com. Pl., Allegheny Cty., Pa. Mar. 16, 2011) (discussing Compl., *The Gardens at Cypress Bay Property Owners Assoc., Inc. v. The Gardens at Cypress Bay Inc.*, No. 03-CP-26-1421 (Ct. Com. Pl., Horry Cty., S.C.)).[4]

The allegations in the Underlying Complaints in this case and in *Indalex* are more clearly product-related than the allegations in underlying complaints that courts in the Third Circuit and the Pennsylvania Superior Court have found insufficient. In *Lenick*, the Third Circuit found that a subcontractor's insurer did not have a duty to defend the subcontractor in a construction suit because the underlying complaint insufficiently pleaded a product-related tort claim: "though the various complaints assert that others may be liable for the property damage, they do not allege that [subcontractor] should be held liable (in negligence or under any other theory) for the faulty products or poor workmanship of others." *Lenick*, 737 F. App'x at 95 (citation and internal quotation marks omitted). Similarly, in *J.J.D. Urethane*, the Superior Court found that, unlike in *Indalex*, "it has never been alleged that the damage to the [contractor's work product] resulted from defective design or bad product manufacturing or was the result of the [subcontractor's product] malfunctioning." *J.J.D. Urethane*, 2018 WL 796428, at *6; *see also*

---

[4] *Indalex* involved many similar, but not identical, underlying complaints, of which *Gardens* is only one. *See* First Am. Compl. 7-8, *Indalex Inc. et al v. Nat'l Union Fire Ins.*, No. GD-06-021147 (Ct. Com. Pl., Allegheny Cty., Pa.). The parties' filings in the *Indalex* case are public records and we may take judicial notice of their existence and contents. *See* Fed. R. Evid. 201(b) (permitting judicial notice of matters of public record).

13

*Northridge Vill.*, 2017 U.S. Dist. LEXIS 140541, at *5-7, 31-32 (stating that complaint insufficiently alleges product-related tort claim when it alleges breach of contract related to structural defects, "defective work" on various construction projects in community, and that contractors were "careless and negligent in the performance of their duties").

Here, although the Owners primarily allege claims for faulty workmanship, they also explicitly bring a claim for negligence, stating broadly that Defendants should be liable for negligently constructing the homes in a manner that presented a danger to the Owners. The Owners also make allegations specific to a product defect theory of negligence, such as that Defendants used faulty materials and that specific materials have caused problems. Moreover, the underlying complaint in Nautilus I alleges physical injury, such as respiratory issues, to persons in the home as a result of the issues with the home. The underlying complaint in Nautilus II similarly alleges that the hazards are "life-threatening." (*Klehr* Compl. ¶ 126.) The breadth of the negligence claim, in combination with allegations regarding use of faulty materials, issues with specific materials, and personal injuries, persuades the Court that the Underlying Complaints could encompass product-related tort claims. We cannot foreclose the possibility that Defendants used a third party's product that actively malfunctioned in an "occurrence." Even though these allegations are far from specific or cohesive, we are required to resolve all doubts in favor of the insured. *See CPB Int'l, Inc.*, 562 F.3d at 596 ("In determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." (citation omitted)). Accordingly, Nautilus has a duty to defend Defendants in the underlying suits until it is clear that there is no longer a possibility of a product-related tort claim. *See Ramara*, 814 F.3d at 674 ("An

insurer must defend its insured until it becomes absolutely clear that there is no longer a possibility that the insurer owes its insured a defense." (citation omitted)).

## IV. CONCLUSION

For the foregoing reasons, Nautilus's Motions for Judgment on the Pleadings will be denied. An appropriate Order follows.

BY THE COURT:

_____
R. BARCLAY SURRICK, J.
